# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

TRACI LYNNE CLARK,

      Petitioner,

v.                                    Case No. 3:21-cv-1063-TJC-SJH

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## ORDER

## I.   Status

Petitioner Traci Lynne Clark, an inmate of the Florida penal system, initiated this action by filing a pro se Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254. See Doc. 1. Petitioner challenges a state court (Putnam County, Florida) judgment of conviction for driving under the influence (DUI) manslaughter. She is serving a 124.95-month term of incarceration, with a four-year minimum mandatory term, to be followed by a four-year term of probation. Respondents filed a Response. See Doc. 10 (Resp.).[1] The Court provided Petitioner with an opportunity to reply (Docs. 9, 12), but

---

[1] Attached to the Response are various exhibits. The Court refers to the exhibits as "Resp. Ex."

she did not do so. This case is ripe for review.[2]

## II.  <u>Governing Legal Principles</u>

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016), <u>cert.</u> <u>denied</u>, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. <u>See</u> <u>Marshall v. Sec'y Fla. Dep't of Corr.</u>, 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. <u>See</u> <u>Harrington v. Richter</u>,

---

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing <u>Chavez v. Sec'y Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is unnecessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is

unaccompanied by an explanation,

> the federal court should "look through" the unexplained
> decision to the last related state-court decision that
> does provide a relevant rationale. It should then
> presume that the unexplained decision adopted the
> same reasoning. But the State may rebut the
> presumption by showing that the unexplained
> affirmance relied or most likely did rely on different
> grounds than the lower state court's decision, such as
> alternative grounds for affirmance that were briefed or
> argued to the state supreme court or obvious in the
> record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a

federal court cannot grant habeas relief unless the state court's adjudication of

the claim was "contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the Supreme Court of the United

States," or "was based on an unreasonable determination of the facts in light of

the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1),

(2). A state court's factual findings are "presumed to be correct" unless rebutted

"by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for
> evaluating state court rulings" and "demands that
> state-court decisions be given the benefit of the doubt."
> Renico v. Lett, 559 U.S. 766, 773 (2010) (internal
> quotation marks omitted). "A state court's
> determination that a claim lacks merit precludes
> federal habeas relief so long as fairminded jurists could

> disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies that are available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate

4

review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>see also</u> <u>Pope</u>

<u>v. Rich</u>, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that <u>Boerckel</u> applies to the

state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state
> prisoner must exhaust available state remedies, 28
> U.S.C. § 2254(b)(1), thereby giving the State the
> "'opportunity to pass upon and correct' alleged
> violations of its prisoners' federal rights.'" <u>Duncan v.</u>
> <u>Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d
> 865 (1995) (per curiam) (quoting <u>Picard v. Connor</u>, 404
> U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To
> provide the State with the necessary "opportunity," the
> prisoner must "fairly present" his claim in each
> appropriate state court (including a state supreme
> court with powers of discretionary review), thereby
> alerting that court to the federal nature of the claim.
> <u>Duncan</u>, <u>supra</u>, at 365-366, 115 S. Ct. 887; <u>O'Sullivan</u>
> <u>v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144
> L.Ed.2d 1 (1999).

<u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies

results in a procedural default which raises a potential bar to federal habeas

review. The United States Supreme Court has explained the doctrine of

procedural default as follows:

> Federal habeas courts reviewing the constitutionality
> of a state prisoner's conviction and sentence are guided
> by rules designed to ensure that state-court judgments
> are accorded the finality and respect necessary to
> preserve the integrity of legal proceedings within our
> system of federalism. These rules include the doctrine

> of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[3] supra, at 747–748, 111 S. Ct. 2546; Sykes,[4] supra, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law. See Coleman, 501 U.S., at 750, 111 S. Ct. 2546.

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be excused under certain circumstances. Notwithstanding that a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). In order for a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from

---

[3] Coleman v. Thompson, 501 U.S. 722 (1991).

[4] Wainwright v. Sykes, 433 U.S. 72 (1977).

> raising the claim and which cannot be fairly attributable to his own conduct." <u>McCoy v. Newsome</u>, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Carrier</u>, 477 U.S. at 488, 106 S. Ct. 2639).[5] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." <u>Id.</u> at 1261 (quoting <u>Carrier</u>, 477 U.S. at 494, 106 S. Ct. 2639).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

In the absence of a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." <u>Carrier</u>, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of

---

[5] <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

### C. Ineffective Assistance of Trial Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003), and <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 687.

Notably, there is no "iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other." <u>Ward v. Hall</u>, 592 F.3d 1144, 1163 (11th

Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

"The question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105); see also Evans v. Sec'y, Dep't

of Corr., 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004).

### III.    **Factual and Procedural Background**

On June 7, 2016, the state charged Petitioner with DUI manslaughter (count one); DUI with damage to property (count 2); and DUI with a blood alcohol level of .08 or higher (count three). Resp. Ex. A. State officials also issued Petitioner a citation for driving on an expired driver's license, which was consolidated with her felony criminal case as count four. Resp. Exs. B, C. On April 21, 2017, Petitioner entered a negotiated plea of nolo contendere to count one in exchange for a four-year term of incarceration (a downward departure from Petitioner's scoresheet guidelines) followed by an eleven-year term of drug offender probation. Resp. Ex. E. Under the plea agreement, the state agreed to nolle prosequi counts two and three, with Petitioner's sentence for count four to be addressed at sentencing. Id.; Resp. Ex. F. During Petitioner's scheduled sentencing hearing on June 12, 2017, Petitioner "expressed dissatisfaction" (Resp. Ex. BB at 3) and presented an ore tenus motion to withdraw her plea (Resp. Ex. G).[6] The trial court granted her request, allowed Petitioner to withdraw her previously entered plea, and set the case for a pretrial status

---

[6] Respondents do not provide a copy of the June 12, 2017, hearing transcript; however, in its response to Petitioner's state postconviction motion, the state explained Petitioner "expressed dissatisfaction" during that hearing. See Resp. Ex. BB at 3.

conference. Id.

On August 23, 2017, the state filed an Amended Information charging Petitioner with DUI manslaughter (count one); DUI with damage to property (count two); and DUI with a blood alcohol level of .15 or higher (count three). Resp. Ex. H. The state ultimately nolle prossed counts two and three and Petitioner proceeded to trial on count one. Resp. Ex. I at 5. The evidence presented at trial is summarized in Petitioner's initial brief filed on direct appeal:

> [Petitioner] was driving her boyfriend's vehicle when it went into the river. [Petitioner] was able to escape the vehicle before it became submerged but [Petitioner]'s boyfriend, Bryan Achison, was unable to get out and died on the scene. Predrag Bulic, chief medical examiner, performed an autopsy on Bryan Achison and determined the cause of death to be drowning.
>
> Robert Baldwin lived nearby Browns Landing, a boat dock in Palatka. Around 3:15 a.m. on October 4, 2015, Mr. Baldwin was awoken by [Petitioner] pounding on the front door. Mr. Baldwin drove [Petitioner] back to the boat dock and called 911 to report the accident.
>
> Justin Bedenbaugh, trooper with the Florida Highway Patrol, arrived at the scene of the accident around 3:30 a.m. and noticed that [Petitioner] had bloodshot, watery eyes, slurred speech, mood swings, and a strong odor of alcohol emitting from her. Mr. Bedenbaugh testified that [Petitioner] consented to a blood draw at the scene of the accident. Mr. Bedenbaugh observed beer cans and a bottle of Fireball whiskey in the rear of the vehicle when it was pulled

out of the river. Richard Newbern, emergency medical technician, performed the blood draw of [Petitioner] at the scene of the accident.

Kenson Jean, crime lab analyst, tested the blood drawn from [Petitioner] and discovered the blood alcohol concentration was 0.282 plus or minus 0.021 and 0.281 plus or minus 0.021 grams per 100 milliliters. Mr. Jean testified that the blood was collected at 4:22 a.m.

Amy Caramagna, bartender, testified that [Petitioner] and Mr. Achison came into the 3D Saloon on October 3, 2015 around 7:30 p.m. Ms. Caramagna also testified that [Petitioner] called her in the morning to discuss tailgating and stated she had already drank a bloody mary. Ms. Caramagna observed [Petitioner] and Mr. Achison consume a couple of pitchers of beer and two shots of Fireball whiskey. At one point in the night, Ms. Caramagna witnessed Mr. Achison stumbling around outside so she provided him some water and started periodically checking on him but did not see when [Petitioner] and Mr. Achison left the establishment.

Desiree Dupont testified that [Petitioner] and Mr. Achison came into Dean's Still around 1:45 a.m. and tried to order two shots of Fireball and a beer. Ms. Dupont served [Petitioner] one Budlight beer. After [Petitioner] drank several sips of it, Ms. Dupont removed the bottle from the bar and poured out the remaining liquid because [Petitioner] displayed behavior that caused Ms. Dupont to become uncomfortable serving her. Ms. Dupont testified that [Petitioner] and Mr. Achison left Dean's Still before 2:00 a.m.

Sergeant Lance Foureau testified that there w[ere] no signs of braking near the crash site and the vehicle was in fourth gear when it was pulled from the river. Mr. Foureau arrived on the scene around 5:35

a.m. and testified that [Petitioner] was displaying signs of impairment such as bloodshot, watery eyes, slurred speech, and mood swings. Mr. Foureau conducted an interview of [Petitioner] and the State published it to the jury. During the interview, [Petitioner] stated that she had four drinks all day.

The State rested. Defense moved for a judgment of acquittal arguing the State failed to establish a prima facie case because there was no evidence of [Petitioner]'s impairment levels at the time the accident actually occurred. The State argued that based upon the evidence introduced, the jury can infer that [Petitioner] did not go from the legal limit or no alcohol in her system to three times the legal limit in a matter of two hours. The court denied [Petitioner]'s motion for judgment of acquittal.

Resp. Ex. T (record citations omitted). Petitioner did not call any trial witnesses and following the charge conference, the defense rested. Resp. Ex. I at 265. The jury then found Petitioner guilty of DUI manslaughter. Resp. Ex. J.

At sentencing, the state asked the trial court to adhere to Petitioner's scoresheet guidelines and sentence her to a 124.95-month term of incarceration. Resp. Ex. L at 28. Defense counsel requested the imposition of a downward departure sentence between four and five years incarceration, arguing that the crime was committed in an unsophisticated manner, it was an isolated incident, [Petitioner] had expressed remorse for her acts, and Mr. Achison was a willing participant. Id. at 35-37. The trial court rejected trial counsel's request and sentenced Petitioner to a 124.95-month term of imprisonment to be followed by a four-year term of drug offender probation. Id. at 38-39.

On direct appeal, Petitioner, with the benefit of counsel, filed an initial brief under Anders v. California, 386 U.S. 738 (1967), representing that no good faith argument of reversible error could be made. Resp. Ex. M. The Fifth District Court of Appeal then entered an order directing Petitioner's appellate counsel to file with the trial court a motion to correct sentencing error under Florida Rule of Criminal Procedure 3.800(b)(2) and advising the parties that the action was no longer proceeding as an Anders appeal. Resp. Ex. O. Petitioner then filed with the trial court a Rule 3.800(b)(2) motion arguing Petitioner did not qualify for drug offender probation and requesting that the probationary portion of her sentence be converted to standard probation. Resp. Ex. P. The trial court held a hearing on the Rule 3.800(b)(2) motion, during which it granted Petitioner's request and converted her term of drug offender probation into regular probation. Resp. Ex. Q. Petitioner, through appellate counsel, again filed an initial brief under Anders. Resp. Ex. T. The state declined to file an answer to the Anders brief. Resp. Ex. U. The Fifth DCA then entered a written order affirming Petitioner's judgment and conviction but remanding for correction of a scrivener's error on Petitioner's written amended order of probation. Resp. Ex. V.

## IV.   The Petition

### A. Ground One

Petitioner asserts that the trial court erred in denying her motion for

judgment of acquittal, violating her due process rights. Doc. 1 at 5-6. According to Petitioner, the state failed to present evidence that she was impaired at the time of the accident because officers tested her blood-alcohol level hours after the accident. Id. at 6.

At the close of the state's case, trial counsel moved for a judgment of acquittal, arguing as follows:

> We would just simply argue that the State has not established a prima facie case before the jury at this time because essentially all the evidence that they have shown is the blood alcohol levels. That would be after a certain amount of time that has passed, not at the time of the accident. I believe there was an indication that the accident and the blood alcohol level draw had been done at a certain amount of time apart, so, therefore, it's not a reflection of what it was at the accident. So, therefore, not a reflection of what the impairment levels may have been at the time the accident actually occurred.
>
> The same goes for any type of impairment issues or observations by the witnesses as to being thick tongued, smelling of alcohol, all those things. Those are all, again, not at the time of the accident and not close enough in time to the accident to establish a prima facie case. And, therefore, a reasonable juror would not have the ability to make that decision on that information.

Resp. Ex. I at 238-39. The state responded:

> There's three elements for DUI manslaughter. One, Traci Lynn Clark drove or was in actual physical control of the vehicle. By her own admissions repeatedly between 911 and Trooper Foureau you hear that she was the driver.

Two, while driving or in actual physical control of [the] vehicle Traci Lynn Clark either -- and it comes down to the blood alcohol level. Your Honor, there's testimony that she is three and a half times the legal limit.

I understand defense's argument that it is not -- there is a time gap, but that gap is -- that gap is possibly two hours when you follow all the times of when they left the -- when they left 3D Saloon -- I'm sorry. When they left Dean's Still. When the 911 call comes in, as well as when Ms. Clark says the accident happens.

Your Honor, at the very least right now in the case -- in the light most favorable to the State the jury can infer that she did not get -- she did not go from a legal limit or no alcohol to three times the legal limit in a matter of two hours.

Lastly, Your Honor, that, as a result of operating the vehicle, Traci Lynn Clark caused or contributed to the -- the cause of death of Bryan Achison. You've heard from the medical examiner that he drowned. You heard from the recorded statement. You heard from 911 -- the 911 call, as well as Mr. Baldwin that Traci Clark was the driver who drove that vehicle into the water. Obviously, had she not driven into the water Mr. Achison cannot drown.

As far as for judgment of acquittal, Your Honor, we ask that you deny the motion as the State has put on at least a prima facie case which is the standard at this point in the hearing -- in the trial.

Resp. Ex. I at 240-41. The trial court then denied Petitioner's motion (id. at 241), and afterwards denied Petitioner's renewed motion once the defense rested its case (id. at 265).

Later, in the Anders brief filed on direct appeal, appellate counsel, on

16

behalf of Petitioner, presented one potential issue for review – whether the trial court erred in denying Petitioner's motion for judgment of acquittal. Resp. Ex. T. The Fifth DCA found the claim lacked merit and affirmed Petitioner's judgment and conviction. Resp. Ex. V; see Jenkins v. Bullard, 210 F. App'x 895, 898 (11th Cir. 2006) (holding that state appellate court's affirmance of petitioner's judgment and sentence reflects that it reviewed issues flagged in Anders brief and found them meritless).[7]

Here, Respondents contend that when raising this issue on direct appeal, Petitioner failed to fairly present the federal nature of this claim to the state court, and thus it is unexhausted and procedurally defaulted. Doc. 10 at 13. They also assert the claim is otherwise without merit. See id. at 18-23.

First, the Court agrees that Petitioner did not present the federal nature of this claim to the state appellate court. In her initial brief filed on direct appeal, Petitioner did not state or suggest that she was raising a federal due process claim, nor did she rely on any other federal constitutional guarantee. Resp. Ex. T. Thus, this claim is unexhausted and procedurally defaulted, and Petitioner has failed to show cause for or prejudice from this procedural bar.

---

[7] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Likewise, Petitioner has not demonstrated that failure to consider this claim on the merits will result in a fundamental miscarriage of justice.

In any event, assuming Petitioner exhausted the federal nature of this claim, and it is otherwise properly presented to the Court, Petitioner is still not entitled to the relief she seeks because the Fifth DCA's affirmance is entitled to deference. When reviewing an insufficiency of the evidence claim in a habeas petition, a federal court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The court must assume that the jury resolved any evidentiary conflicts in favor of the prosecution, and the court must defer to that resolution. Id.

Here, the evidence presented at trial supported the trial court's denial of Petitioner's motion for judgment of acquittal. As the state noted when responding to Petitioner's ore tenus motion for judgment of acquittal, while officers did not test Petitioner's blood-alcohol level immediately after the accident, it is unlikely that Petitioner's blood-alcohol level would have increased to three times the legal limit during the two-hour timelapse between the accident and her blood draw. Indeed, the jury found Petitioner guilty of DUI manslaughter as charged in the Amended Information. Resp. Ex. J. In doing so, the jury found that the state proved these three elements beyond a reasonable

doubt:

> One: [Petitioner] drove or was in actual physical control of a vehicle. Two: While driving, or in actual control of the vehicle, [Petitioner] either, A, was under the influence of alcoholic beverages to the extent that her normal faculties were impaired, or, B, had a blood alcohol level of point 08 or more grams of alcohol per 100 milliliters of blood. And, three: As a result of operating the vehicle [Petitioner] caused or contributed to the cause of the death of Bryan Achison.

Resp. Ex. I at 292; see also § 316.193(3)c(3)a, Fla. Stat. Taken in the light most favorable to the state, the Court finds there was sufficient evidence to permit a rational trier of fact to find Petitioner guilty of this offense. As such, upon review of the record, this Court concludes that the state court's adjudication of this claim was not contrary to clearly established federal law, did not involve an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. Ground One is denied.

## B. Ground Two

Petitioner argues that her trial counsel was ineffective for advising her to reject the state's four-year plea offer and proceed to trial. Doc. 1 at 7. According to Petitioner, trial counsel guaranteed her that if she went to trial, she would receive a "more beneficial" sentence or outcome. Id. She contends trial counsel failed to advise her that her DUI manslaughter charge carried a four-year minimum mandatory sentence, the state's plea offer was below her scoresheet

guidelines, and that the plea offer was less than any sentence she would receive if she was found guilty at trial. Id. She also contends she was unaware that if she was convicted at trial, the trial court would likely follow her scoresheet guidelines when imposing her sentence unless it found a downward departure was appropriate. Id. Petitioner asserts that if trial counsel properly informed her of the consequences and benefits surrounding the offer, she would have accepted. Id. at 9. And she argues that the postconviction court erred in failing to hold an evidentiary hearing on this issue. Id.

Petitioner raised this claim in her Florida Rule of Criminal Procedure 3.850 motion. Resp. Ex. Z. The trial court summarily denied the claim as follows:

> As to Defendant's claims that her attorneys misled her because she was unaware of the minimum possible sentence, the maximum possible sentence, and the four-year minimum mandatory sentence, these claims are refuted by the record. On April 21, 2017, Defendant entered a plea in this case. The Plea Agreement, which she initialed and signed, clearly states under the "charges" section that the maximum imprisonment for her charge was fifteen years and there was a four-year minimum mandatory. The handwritten negotiated agreement section on page one states that the four year offer was a "min/man" and that "This is a downward departure from the scoresheet." The Defendant's initials, TC, appear at the end of the handwritten section on page two of the Plea Agreement. Furthermore, there is a hand written section where it clearly states the scoresheet minimum [was] 194.6 points or 124.95 months DOC, approximately 10.5 years. Defendant initialed

throughout the Plea Agreement that she understood the possible sentence, agreed upon the sentence, and that she was satisfied with her Counsel. She signed at the end of it. The plea was accepted by the Court and set out for sentencing on June 12, 2017.

On June 12, 2017, Defendant came back to Court for sentencing. At that time, she expressed dissatisfaction and was ultimately allowed to withdraw the plea. The case was set for docket call on August 21, 2017, and jury selection on August 28, 2017. On August 28, 2017, before jury selection commenced, there was a conversation on the record about the plea negotiations that occurred in this case. Assistant State Attorney Janesk placed on the record the maximum penalty of fifteen years, the four-year minimum mandatory, and the fact that death points would bring her scoresheet minimum to around ten and a half years. He also placed on the record that Defendant did not want either of the State's offers and that she wanted a jury trial. Trial Counsel Hubbard placed on the record that all of this had been communicated to his client. The Trial Court asked Defendant if she understood all of the above and discussed it with her attorneys, and Defendant agreed. The Trial Court ultimately sent Defendant into the jury deliberation room to speak to her attorneys for a period of time to discuss their options. After those discussions, Defendant stated her decision to go to trial.

In order to prevail on her claim and establish prejudice, Defendant must allege and show a reasonable probability sufficient to undermine confidence in the outcome that 1) she would have accepted the offer had Counsel advised her correctly, 2) the Prosecutor would not have withdrawn the offer, 3) the Court would have accepted the offer, and 4) the conviction and/or sentence under the offer's terms would have been less severe than under the judgment and sentence that was imposed. Alcorn v. State, 121 So. 3d 419, 430 (Fla. 2013).

A review of the record shows that Defendant agreed that she had spoken to Trial Counsel before August 28, 2017, and she was given an opportunity to speak again to her Counsel that day. After those opportunities, she did not accept the State's offer. The record indicates that Hubbard had reached back out to the Assistant State Attorney to re-secure the opportunity for a pre-trial plea offer after it had been withdrawn by the State. Defendant was given an opportunity multiple times prior to jury selection to accept offers that would have constituted downward departures. Defendant entered a written plea agreement but decided to withdraw her plea and go to trial. Defendant has not met her burden on the first prong of Alcorn.

Nor can she meet her burden on the second prong of Alcorn, that the Prosecutor would not have withdrawn the offer. It was clear that after Defendant rejected the offer and decided to proceed to trial, the offer was withdrawn. At no time during the proceedings on August 28, 2017 did the Prosecutor place the offer back on the table.

The Court finds that the first two prongs of Alcorn have not been met. Ground One is denied.

Resp. Ex. CC at 3-5 (record citations omitted). Petitioner appealed, and the Fifth DCA per curiam affirmed the trial court's denial without a written opinion. Resp. Ex. GG. The Court addresses this claim in accordance with the deferential standard for federal court review of state court adjudications.

In doing so, the Court defers to the state court's conclusion that Petitioner has failed to satisfy the purviews of Strickland. In the context of a rejected plea offer, the prejudice prong requires the movant to show "a reasonable probability

that but for counsel's ineffectiveness: (1) 'the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances)'; (2) 'the court would have accepted its terms'; and (3) 'the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.'" Osley v. United States, 751 F.3d 1214, 1222 (11th Cir. 2014) (quoting Lafler v. Cooper, 566 U.S. 156, 164 (2012)). But "after the fact testimony concerning [the movant's] desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, [s]he would have accepted the plea offer." Diaz v. United States, 930 F.2d 832, 835 (11th Cir. 1991).

Here, unlike typical claims challenging a trial counsel's alleged misadvise regarding a plea offer, the record shows Petitioner at first accepted the state's four-year plea offer, but later withdrew that acceptance and advised the trial court she wished to proceed to trial. That said, even under these circumstances, Petitioner has not shown a reasonable probability that absent counsel's alleged misconduct, Petitioner would have not withdrawn her plea or that the state, following Petitioner's withdrawal, would have renewed that offer given intervening circumstances. Indeed, Petitioner seemingly alleges that she would not have withdrawn her acceptance if trial counsel advised her (1) the charge in count one carried a four-year minimum mandatory sentence, (2) the state's

plea offer was below her scoresheet guidelines, and (3) the plea offer was below any sentence she would receive if she was found guilty at trial unless the trial court found a downward departure sentence was appropriate. But, as the trial court explained, the April 21, 2017, written negotiated plea form clearly stated that the maximum sentence for count one – DUI manslaughter – was fifteen years with a four-year minimum mandatory. Resp. Ex. E. It also noted that Petitioner's scoresheet guidelines for count one totaled 124.95 months (about 10.5 years) and that, under the plea agreement, the state would concede to the imposition of a downward departure sentence of four years for count one and nolle pros the charges in counts two and three. Id. at 1-2. Petitioner signed the written agreement and certified her understanding of the consequences and benefits of its terms by initialing each provision within the document. Id.

On June 12, 2017, during what would have been Petitioner's sentencing hearing, Petitioner verbally moved to withdraw her plea and the trial court granted her request.[8] Resp. Ex. G. On August 28, 2017, before jury selection, the trial court, the state attorney (Mr. Janesk), defense counsel (Mr. Hubbard), and Petitioner had the following discussion about prior plea negotiations:

> MR. JANESK: Your Honor, originally the offer was 4 followed by 11 years of probation. Special condition drug offender probation, with the condition of paying the restitution for the funeral expenses. That offer at

---

[8] As noted, the record does not contain a copy of the June 12, 2017, transcript.

one point was accepted. And then at sentencing the defendant requested to withdraw her plea.

Mr. Hubbard got on the case.[9] He resecured that offer for a limited time. They -- that did not happen. The last offer that kind of went back and forth was either straight six -- two options, really: either a DOC range of four to six years, with the restitution and the probation on the back end; or just an agreed-upon six, follow[ed] by the remainder of probation.

It's my understanding that the defendant doesn't want that offer. I just want to get all that on record, Your Honor.

Essentially what it would be is -- obviously, her scoresheet --

I'm sorry. Four to eight. I'm sorry. I misspoke, Your Honor.

It was essentially -- with a scoresheet -- if the defendant was found guilty, the scoresheet would be about ten-and-a-half years minimum. So I just wanted to get all that on the record.

And I understand that the defendant doesn't want it. She wants a jury trial.

THE COURT: And I understand the DUI manslaughter is a second-degree felony, maximum is 15 years.

MR. JANESK: Maximum is 15 years, Your Honor. There is a four-year minimum mandatory that comes with it. However, once the -- if found guilty, once the death points are factored in, the scoresheet minimum really becomes ten and a half.

---

9 Assistant Public Defender Tyler Williams represented Petitioner throughout her case and Assistant Public Defender James Hubbard later joined as William's cochair for Petitioner's trial.

THE COURT: I see. Ms. Clark, do you understand all that?

THE DEFENDANT: A little bit.

THE COURT: What part do you not understand?

. . .

THE DEFENDANT: I'm just not sure right now. I don't -- I don't know what's -- I mean, it was four to eight earlier. Now it's four to six.

MR. JANESK: And I misspoke. I meant four to eight. I'm sorry. It was -- four to eight was the range, or a straight six.

Basically, if -- if there wants to be some wiggle room where Defense can argue for just the minimum and I can argue for more, so be it. If they want to just take a guaranteed six, that's fine as well. But those are the two -- I don't mean to have a door one or two. But that way the defendant can have a little bit of options.

THE COURT: Okay. So if I understand correctly, the plea agreement is a downward departure from the guidelines.

MR. JANESK: It would be, Your Honor.

THE COURT: Okay. And who's going to be lead counsel for the --

MR. HUBBARD: I will be, Your Honor.

THE COURT: You're Mr. Hubbard?

MR. HUBBARD: Yes, sir.

THE COURT: All right. And has -- has all that been

communicated to your client?

MR. HUBBARD: It has, Your Honor.

THE COURT: Okay.

And, Ms. Clark, do you understand that if you're convicted as charged, to some extent, the four-year mandatory minimum would apply. And absent a good legal reason which is outlined by statute for me to depart, I would not have the ability to depart from what appears to be ten-and-a-half years.

Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. Have you discussed that with your attorneys?

THE DEFENDANT: Yes, sir.

THE COURT: Now, I want you to understand, I don't know anything about you. I don't -- I don't know anything about the facts of this case. I learn about what the facts are the same time the jury does.

So if the route that you-all go, which I call it a high/low, which is one of -- one of the options between --

Was it four and eight?

MR. JANESK: Four and eight, Your Honor. Yes.

THE COURT: Okay. I can tell you, I started as [an] assistant public defender in 1980. And during the course of my career I've had plea ranges where -- some judges, they start at the top. And it's my -- defense lawyers' obligation to talk them down. There are some judges, they start at the bottom. And it's up to the prosecutor to work them up. Okay? I don't take either

approach.

If it's a range -- I have to rely on the attorneys to bring evidence and testimony to try to get the appropriate sentence for your case.

Now, like I said, I don't know anything about you. I don't know if you have any prior record whatsoever. You'd be entitled -- if you don't, you'd have -- you'd be entitled to a presentence investigation, which would help some.

But once -- once the witnesses start testifying, control of the case is out of everybody else's hands, and it's up to a jury at that point. And then decisions are made from then. Okay?

THE DEFENDANT: Yes, sir.

THE COURT: So if you would --

Is she out on bond?

MR. HUBBARD: She is.

THE COURT: Okay. Before we bring the jury up, I'd like for you and your attorneys to go into the jury room one last time and -- while I'm taking the plea in this other case -- and discuss realistically what the options are.

And sometimes in life -- and I've been in Mr. Hubbard and Mr. Williams' position as assistant public defender, and then later in private practice, where your client has a choice between two distasteful options, and one of which is the unknown future.

So it's a distasteful known versus an unknown, which can be catastrophic. Okay?

So why don't y'all go into the jury room and talk

one last time, ma'am, while I take care of this other case.

THE DEFENDANT: Yes sir.

. . . .

THE COURT: Ms. Clark, have you had an opportunity to discuss the plea negotiations one last time with your attorneys?

THE DEFENDANT: Yes, sir.

THE COURT: And what has been your decision as to whether to take the plea agreement or go to trial?

THE DEFENDANT: Trial.

THE COURT: Pardon?

THE DEFENDANT: Trial.

THE COURT: Go to trial. All right.

Resp. Ex. BB at 567-72.

This record evidence shows that when Petitioner withdrew her negotiated plea to the state's four-year offer, it was resurrected again but Petitioner did not accept it. Then, the state declined trial counsel's later attempt to revive the terms of that offer and instead presented Petitioner with two other options. Notably, the state explained that Petitioner could enter a plea in exchange for either a sentence within a four-to-eight-year range, or a six-year term of incarceration. Thus, Petitioner has failed to show that despite intervening circumstances, the state was willing to revive its four-year offer.

The record also shows that Petitioner was unwilling to accept the state's four-year offer or any of the state's other proposed plea terms. Indeed, Petitioner maintained her refusal to plea despite being fully aware of the maximum sentence she faced if she went to trial, including the four-year minimum mandatory, and despite knowing that the proposed sentences under the offers were downward departures from her sentencing guidelines. After Petitioner advised the trial court, under oath, that she knew the benefits of these plea offers, the trial court afforded her additional time to reconsider her rejection. But notwithstanding that additional consideration, Petitioner upheld her decision to proceed to trial. "Given [Petitioner's] awareness of the plea offer[s], [her] after the fact testimony concerning [her] desire to plead, without more, is insufficient to establish that but for counsel's alleged advice or inaction, [s]he would have accepted the plea offer[s]." Diaz, 930 F.2d at 835. Petitioner was steadfast in her decision to reject all plea offers. Thus, upon thorough review of the record and the applicable law, the Court concludes that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it is not based on an unreasonable determination of the facts in light of the evidence presented to the state court.

Also, to the extent that Petitioner claims the postconviction court erred in failing to hold an evidentiary hearing on this claim, that allegation is an issue of state law and includes no federal constitutional infirmity. Such claims that

do not present a constitutional challenge to the validity of Petitioner's judgment and sentence are not cognizable on federal habeas review. See Anderson v. Sec'y for Dep't of Corr., 462 F.3d 1319, 1330 (11th Cir. 2006)) ("We have held the state court's failure to hold an evidentiary hearing on a petitioner's 3.850 motion is not a basis for federal habeas relief."). As such, Ground Two is denied.

### C. Ground Three

Petitioner argues that the trial court erred in granting the state's motion for destruction of evidence, violating her rights under the Fourth Amendment and Due Process Clause. Doc. 1 at 10. According to Petitioner, when she filed her Rule 3.850 motion with the state court on May 16, 2019, the clerk reclassified her trial court case to "REOPEN status." Id. As such, according to Petitioner, the trial court's December 11, 2019, order granting the state's motion for destruction of evidence was improper because "as long as the instant case remained open, in any capacity," the trial court is prohibited from permitting the destruction of any evidence. Id.

Respondents argue that this claim is unexhausted and procedurally defaulted. Resp. at 14-16. The Court agrees.

On December 11, 2019, about a year after the Fifth DCA affirmed Petitioner's judgment and conviction and while Petitioner's Rule 3.850 motion was pending, the state filed with the trial court an "In re" motion for destruction of evidence under § 893.12, Florida Statutes, seeking an order to permit the

31

destruction of "certain controlled substances and confiscated property items." Resp. Ex. II. That same day, the trial court entered an "In re" order granting the state's request. Resp. Ex. JJ. Petitioner did not appeal the trial court's order or otherwise seek review of the trial court's decision in state court even though she had the ability to do so. Indeed, claims challenging the destruction of evidence are cognizable under Rule 3.850. See McDonald v. State, 2 So. 3d 1018, 1019 (Fla. 3d DCA 2008) (noting that the appellant's claim that the prosecution destroyed evidence in bad faith is cognizable in a Rule 3.850 motion).

Here, Petitioner alleges she learned about the trial court's order granting the state's motion for destruction of property seven months after the trial court issued its order – on or around July 12, 2020. See Doc. 1 at 10. The trial court did not issue its order denying Petitioner's Rule 3.850 motion until December 8, 2020. Resp. Ex. CC. And thus, Petitioner had more than four months to amend her pending Rule 3.850 motion to raise this claim and exhaust it for purposes of federal habeas review. However, she did not do so. As a result, this claim is unexhausted and procedurally defaulted, and Petitioner has failed to show cause for or prejudice from this procedural bar. Likewise, Petitioner has failed to demonstrate that failure to consider this claim on the merits will result in a fundamental miscarriage of justice. Ground Three is denied.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.     The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED WITH PREJUDICE**.

2.     The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

3.     If Petitioner appeals this denial, the Court denies a certificate of appealability. Because this Court has determined that a certificate of appealability is not warranted, the Clerk shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[10]

**DONE AND ORDERED** at Jacksonville, Florida, this 29th day of January, 2025.



TIMOTHY J. CORRIGAN
Senior United States District Judge

---

[10] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.

Jax-7

C:      Traci Lynne Clark, V53270
        Counsel of record